EXHIBIT A

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.   THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.

FOR FLORIDA RESIDENTS: THE UNITS REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING A PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER. AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER. THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED WITH THE FLORIDA OFFICE OF FINANCIAL REGULATION.

## 12 GIGS, INC.

### CONVERTIBLE PROMISSORY NOTE

**Principal Amount**

**$100,000.00**

**Date of Issuance**

**January 25, 2012**

FOR VALUE RECEIVED, **12 Gigs, Inc.**, a California corporation (the "Company"), hereby promises to pay to the order of **Dan Vigdor** (the "Lender"), the principal amount identified above, together with interest thereon from the date of issuance of this Convertible Promissory Note identified above.  Interest shall accrue at a rate of six percent (**6%**) per annum, compounded annually.  Unless earlier converted into Conversion Shares pursuant to Section 2.2 of that certain Note Purchase Agreement dated September 26, 2011  among the Company, Lender and certain other investors (the "Purchase Agreement"), the principal and accrued interest shall be due and payable by the Company on demand by the Majority Note Holders at any time after the Maturity Date.

This Note is one of a series of Convertible Promissory Notes issued pursuant to the Purchase Agreement. Capitalized terms not defined herein shall have the meaning set forth in the Purchase Agreement.

1.    Payment.  All payments shall be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the holder hereof may from time to time designate in writing to the Company.  Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal.  Prepayment of principal, together with accrued interest, may not be made without the



CONFIDENTIAL

SLC00002662

written consent of the Majority Note Holders. The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

    2.    <u>Security</u>. This Note is a general unsecured obligation of the Company.

    3.    <u>Conversion of the Notes</u>. This Note and any amounts due hereunder shall be convertible into Conversion Shares in accordance with the terms of Section 2.2 of the Purchase Agreement. As promptly as practicable after the conversion of this Note, the Company at its expense shall issue and deliver to the holder of this Note, upon surrender of the Note, a certificate or certificates for the number of full Conversion Shares issuable upon such conversion. The "<u>Conversion Price</u>" applicable to this Note shall be:

    3.1    with respect to a conversion pursuant to Section 2.2(a) of the Purchase Agreement, the lower of (A) the product of (y) **85%** and (z) the price paid per share for Equity Securities by the investors in the Next Equity Financing or (B) the quotient resulting from dividing (y) the Valuation Cap (as defined below) by (z) the number of shares of outstanding common stock of the Company immediately prior to the closing of the Next Equity Financing (assuming conversion of all securities convertible into common stock, exercise of all outstanding options and warrants to purchase common stock, but excluding, for this purpose, the conversion contemplated by Section 2.2(a) of the Purchase Agreement); and

    3.2    with respect to a conversion pursuant to Section 2.2(b) of the Purchase Agreement, the quotient resulting from dividing (A) the Valuation Cap (as defined below) by (B) the number of shares of outstanding common stock of the Company immediately prior to the closing of the Corporate Transaction (assuming conversion of all securities convertible into common stock and exercise of all outstanding options and warrants to purchase common stock, but excluding, for this purpose, the conversion contemplated by Section 2.2(b) of the Purchase Agreement).

    3.3    "<u>Valuation Cap</u>" shall mean $6,000,000; *provided, however,* that the Valuation Cap shall automatically be $4,000,000 if the following circumstance occurs:

    (a)    the Company does not raise an aggregate of at least $1,000,000.00 principal amount of convertible promissory notes pursuant to the Purchase Agreement by March 30, 2012 (including this Note and previously issued Notes), and

    (b)    the Company does not record gross revenue of $21,000.00 or more during any seven (7) consecutive day period prior to March 15, 2012.

    4.    <u>Amendments and Waivers; Resolutions of Dispute; Notice</u>. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted pursuant to the terms of the Purchase Agreement.

    5.    <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the successors and assigns of the parties hereto; *provided, however,* that the Company may not assign its obligations under this Note without the written consent of the Majority Note Holders. Any transfer of this Note may be effected only pursuant to the Purchase Agreement and by

<div align="center">2</div>



CONFIDENTIAL

p.5

SLC00002663

surrender of this Note to the Company and reissuance of a new note to the transferee.  The Lender and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and any other Lenders.

6.      **Officers and Directors not Liable**.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

7.      **Expenses**.  The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs").  The Company agrees that any delay on the part of the holder in exercising any rights hereunder will not operate as a waiver of such rights.  The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

8.      **Governing Law**.  This Note shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California.  Notwithstanding any provision of this Convertible Promissory Note to the contrary, this Convertible Promissory Note shall be (to the extent necessary to satisfy the requirements of Section 22062(b)(3)(D) of the California Financial Code) subject to the implied covenant of good faith and fair dealing arising under Section 1655 of the California Civil Code.

9.      **Approval**.  The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Convertible Promissory Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.  In addition, the Company hereby represents that it intends to use the principal of this Convertible Promissory Note primarily for the operations of its business, and not for any personal, family or household purpose.

10.     **Warrant**.  As a further inducement to the parties to enter into this transaction, the Company shall issue a warrant to purchase shares of Class A Common Stock of the Company in substantially the form attached hereto as Exhibit A.

**12 GIGS, INC.**

By: _____

Nicholas Talarico
Chief Executive Officer

3

CONFIDENTIAL

SLC00002664

EXHIBIT B

# 12 GIGS, INC.

## NOTE PURCHASE AGREEMENT

### SEPTEMBER 26, 2011

CONFIDENTIAL

SLC00004521

## TABLE OF CONTENTS

Page

1.  Definitions ....................................................................................................................... 1

2.  Amount and Terms of the Notes ...................................................................................... 2
    2.1  Issuance of Notes ................................................................................................... 2
    2.2  Right to Convert Notes .......................................................................................... 3

3.  Closing Mechanics ........................................................................................................... 3
    3.1  Closing ................................................................................................................... 3
    3.2  Subsequent Closings ............................................................................................. 3

4.  Representations and Warranties of the Company ............................................................ 4
    4.1  Organization, Good Standing and Qualification ................................................... 4
    4.2  Authorization ......................................................................................................... 4
    4.3  Compliance with Other Instruments ..................................................................... 4
    4.4  Valid Issuance of Stock ......................................................................................... 4

5.  Representations and Warranties of the Lenders ............................................................... 4
    5.1  Authorization ......................................................................................................... 4
    5.2  Purchase Entirely for Own Account ...................................................................... 5
    5.3  Disclosure of Information ...................................................................................... 5
    5.4  Investment Experience .......................................................................................... 5
    5.5  Accredited Investor ............................................................................................... 5
    5.6  Restricted Securities .............................................................................................. 5
    5.7  Variation Among Notes ......................................................................................... 5
    5.8  Further Limitations on Disposition ....................................................................... 6
    5.9  Legends .................................................................................................................. 6

6.  State Commissioners of Corporations ............................................................................. 6
    6.1  California Corporate Securities Law ..................................................................... 6

7.  Miscellaneous .................................................................................................................. 7
    7.1  Successors and Assigns ......................................................................................... 7
    7.2  Governing Law ...................................................................................................... 7
    7.3  Counterparts; Signatures ....................................................................................... 7
    7.4  Titles and Subtitles ............................................................................................... 7
    7.5  Notices ................................................................................................................... 7
    7.6  Finder's Fee ........................................................................................................... 8
    7.7  Expenses ................................................................................................................ 8
    7.8  Entire Agreement; Amendments and Waivers ...................................................... 8
    7.9  Effect of Amendment or Waiver ........................................................................... 8
    7.10 Severability ........................................................................................................... 9
    7.11 "Market Stand-Off" Agreement ........................................................................... 9
    7.12 Stock Purchase Agreement .................................................................................. 10

i



CONFIDENTIAL

SLC00004522

7.13    Exculpation Among Lenders............................................................................ 10
7.14    Acknowledgement........................................................................................... 10
7.15    Covenants of the Company to Deliver Information and Financial
          Statements .................................................................................................... 10
7.16    Further Assurance .......................................................................................... 10

ii

CONFIDENTIAL

SLC00004523

## NOTE PURCHASE AGREEMENT

**THIS NOTE PURCHASE AGREEMENT** ("Agreement") is made as of September 26, 2011, by and among **12 Gigs, Inc.**, a California corporation (the "Company"), and the lenders (each individually a "Lender," and collectively the "Lenders") named on the Schedule of Lenders attached hereto (the "Schedule of Lenders"). Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in Section 1 below.

**WHEREAS,** each Lender intends to provide certain Consideration to the Company as described for each Lender on the Schedule of Lenders;

**WHEREAS,** the parties wish to provide for the sale and issuance of such Notes in return for the provision by the Lenders of the Consideration to the Company; and

**WHEREAS,** the parties intend for the Company to issue in return for the Consideration one or more Notes convertible into shares of the Company's Equity Securities.

### NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

1. Definitions.

   (a) "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For the purposes of this definition, "control" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

   (b) "Consideration" shall mean the amount of money paid by each Lender pursuant to this Agreement as shown on the Schedule of Lenders.

   (c) "Conversion Shares" shall, for purposes of determining the type of Equity Securities issuable upon conversion of the Notes, mean:

   (i) with respect to a conversion pursuant to Section 2.2(a), the Equity Securities issued in the Next Equity Financing; and

   (ii) with respect to a conversion pursuant to Section 2.2(b), shares of the Company's Class A Common Stock.

   (d) "Conversion Price" for each Note shall be set forth in the applicable Note.

   (e) "Corporate Transaction" shall include any of the following transactions: (i) the closing of the sale, transfer or other disposition of all or substantially all of the Company's assets, (ii) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company



CONFIDENTIAL

SLC00004524

immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Company or the surviving or acquiring entity), (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a Person or group of affiliated Persons (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such Person or group of affiliated Persons would hold 50% or more of the outstanding voting stock of the Company (or the surviving or acquiring entity) or (iv) a liquidation, dissolution or winding up of the Company; *provided, however,* that a transaction shall not constitute a Corporate Transaction if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the Persons who held the Company's securities immediately prior to such transaction.

      (f)    "Equity Securities" shall mean the Company's Common Stock or Preferred Stock or any securities conferring the right to purchase the Company's Common Stock or Preferred Stock or securities convertible into, or exchangeable for (with or without additional consideration), the Company's Common Stock or Preferred Stock, except any security granted, issued and/or sold by the Company to any director, officer, employee or consultant of the Company in such capacity for the primary purpose of soliciting or retaining their services.

      (g)    "Majority Note Holders" shall mean the holders of a majority in interest of the aggregate principal amount of Notes outstanding as of the relevant time.

      (h)    "Maturity Date" shall mean, with respect to each Note issued under this Agreement, the date that is thirty-six (36) months following the date of issuance of such Note.

      (i)    "Next Equity Financing" shall mean the next sale (or series of related sales) by the Company of its Equity Securities from which the Company receives gross proceeds of not less than $750,000 (excluding the aggregate amount of debt securities converted into Equity Securities upon conversion of the Notes pursuant to Section 2.2 below).

      (j)    "Notes" shall mean the one or more promissory notes issued to each Lender pursuant to Section 2.1 below, in the principal amounts set forth on the Schedule of Lenders, with such Conversion Prices, interest rates and other terms and conditions as may be agreed by the Company and the applicable Lender and set forth in the applicable Note. The Notes are subordinate in right of payment to all current and future certain indebtedness to banks and other institutions.

      (k)    "Person" means any individual, corporation, partnership, limited liability company, business trust, joint venture, joint stock company, trust, unincorporated organization or other entity or any government authority.

    2.    Amount and Terms of the Notes.

      2.1    Issuance of Notes. In return for the Consideration paid by each Lender, the Company shall sell and issue to such Lender one or more Notes. Each Note shall have a principal balance equal to that portion of the Consideration paid by such Lender for the Note, as set forth in the Schedule of Lenders. Each Note shall be convertible into Conversion Shares pursuant to Section 2.2 below.

2

CONFIDENTIAL        SLC00004525

2.2   Right to Convert Notes.

(a)   Next Equity Financing.  The principal and unpaid accrued interest of each Note will be automatically converted into Conversion Shares upon the closing of the Next Equity Financing.  Notwithstanding the foregoing, accrued interest on this Note may be paid in cash at the option of the Company.  The number of Conversion Shares to be issued upon such conversion shall be equal to the quotient obtained by dividing the outstanding principal and unpaid accrued interest on a Note to be converted, or portion thereof, on the date of conversion, by the Conversion Price.  At least five (5) days prior to the closing of the Next Equity Financing, the Company shall notify the holder of each Note in writing of the terms under which the Equity Securities of the Company will be sold in such financing.  The issuance of Conversion Shares pursuant to the conversion of each Note shall be upon and subject to the same terms and conditions applicable to the Equity Securities sold in the Next Equity Financing.

(b)   Corporate Transaction.  In the event of a Corporate Transaction prior to full payment of a Note or prior to the time when a Note may be converted (as provided herein), at Lender's election, (i) all outstanding principal and unpaid accrued interest due on such Note shall be converted into that number of Conversion Shares equal to the quotient obtained by dividing the outstanding principal and unpaid accrued interest on a Note to be converted, or portion thereof, on the date of conversion, by the Conversion Price; or (ii) the Lender shall be paid an amount equal to all outstanding principal and accrued and unpaid interest.

(c)   No Fractional Shares.  Upon the conversion of a Note into Conversion Shares, in lieu of any fractional shares to which the holder of the Note would otherwise be entitled, the Company shall pay the Note holder cash equal to such fraction multiplied by the Conversion Price.

(d)   Mechanics of Conversion.  The Company shall not be required to issue or deliver the Conversion Shares until the Note holder has surrendered the Note to the Company.  Such conversion may be made contingent upon the closing of the Next Equity Financing or Corporate Transaction.

3.   Closing Mechanics.

3.1   Closing.  The initial closing (the "Closing") of the purchase of the Notes in return for the Consideration paid by each Lender shall take at such time and place as mutually agreed by the Company and the Lenders purchasing a majority in interest of the aggregate principal amount of the Notes to be sold at the Closing agree upon orally or in writing.  At the Closing, each Lender shall deliver the Consideration to the Company and the Company shall deliver to each Lender one or more executed Notes in return for the respective Consideration provided to the Company.

3.2   Subsequent Closings.  In any subsequent closing (each a "Subsequent Closing"), the Company may sell additional Notes subject to the terms of this Agreement to any Lender as it shall select, *provided* that the aggregate amount of Consideration does not exceed $1,500,000.  Any subsequent purchasers of Notes shall become a party to, and shall be entitled to receive Notes in accordance with, this Agreement.  Each Subsequent Closing shall take place at

3

CONFIDENTIAL

SLC00004526

such locations and at such times as shall be mutually agreed upon orally or in writing by the Company and such purchasers of additional Notes.

4. <u>Representations and Warranties of the Company</u>. In connection with the transactions provided for herein, the Company hereby represents and warrants to the Lenders that:

4.1 <u>Organization, Good Standing and Qualification</u>. The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of California and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

4.2 <u>Authorization</u>. Except for the authorization and issuance of the shares issuable in connection with the Next Equity Financing, all corporate action has been taken on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes. Except as may be limited by applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Notes, the valid and enforceable obligations they purport to be.

4.3 <u>Compliance with Other Instruments</u>. Neither the authorization, execution and delivery of this Agreement, nor the issuance and delivery of the Notes, will constitute or result in a material default or violation of any law or regulation applicable to the Company or any material term or provision of the Company's current Certificate of Incorporation or bylaws or any material agreement or instrument by which it is bound or to which its properties or assets are subject.

4.4 <u>Valid Issuance of Stock</u>. From and after the amendment of the Company's Articles of Incorporation (if needed), the Conversion Shares to be issued, sold and delivered upon conversion of the Notes will be duly authorized and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Lenders in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

5. <u>Representations and Warranties of the Lenders</u>. In connection with the transactions provided for herein, each Lender hereby represents and warrants to the Company that:

5.1 <u>Authorization</u>. This Agreement constitutes such Lender's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. Each Lender represents that it has full power and authority to enter into this Agreement.

4

Jan 25 12 06:39p

CONFIDENTIAL

SLC00004527

5.2     Purchase Entirely for Own Account.  Each Lender acknowledges that this Agreement is made with Lender in reliance upon such Lender's representation to the Company that the Notes, the Conversion Shares, and any Common Stock issuable upon conversion of the Conversion Shares (collectively, the "Securities") will be acquired for investment for Lender's own account, not as a nominee or agent (unless otherwise specified on such Lender's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that such Lender has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, each Lender further represents that such Lender does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to the Securities.

5.3     Disclosure of Information.  Each Lender acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities. Each Lender further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

5.4     Investment Experience.  Each Lender is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities. Each Lender understands and acknowledges that the purchase of the Notes involves a high degree of risk, and that the Company's future prospects are uncertain. Each Lender is able to hold the Notes and Conversion Shares indefinitely if required, and is able to bear the loss of its entire investment. If other than an individual, each Lender also represents it has not been organized solely for the purpose of acquiring the Securities.

5.5     Accredited Investor.  Each Lender is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.6     Restricted Securities.  Each Lender understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act of 1933 (the "Act") only in certain limited circumstances. Each Lender represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.7     Variation Among Notes.  Each Lender acknowledges and agrees that the Conversion Prices, interest rates and other terms and conditions set forth in the Notes may vary from Lender to Lender, depending on the specific terms negotiated and agreed between the Company and each applicable Lender. Each Lender understands that by entering into this Agreement, such Lender has relinquished any claim against the Company and its officers and directors and against any other Lender in connection with the variation among the Notes.

5

CONFIDENTIAL

SLC00004528

5.8    Further Limitations on Disposition.  Without in any way limiting the representations and warranties set forth above, each Lender further agrees not to make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Company to be bound by this Section 5, Section 7.11 and:

(a)    There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)    (i) Lender has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition and (ii) if reasonably requested by the Company, Lender shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Act.  It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in extraordinary circumstances.

Lender shall not make any disposition of any Note, Conversion Share or Securities to any of the Company's competitors as such is in good faith determined by the Company.

5.9    Legends.  It is understood that the Securities may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

6.    State Commissioners of Corporations.

6.1    California Corporate Securities Law.  THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION FOR SUCH SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE.  THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

CONFIDENTIAL

SLC00004529

7.    Miscellaneous.

7.1    Successors and Assigns. This Agreement, the Notes and the rights hereunder are not assignable unless such assignment is consented to in writing by both the Company and the Majority Note Holders, except that any Lender may assign its rights hereunder (i) if such Lender is a partnership or limited liability company, to any partner, member, manager or Affiliate thereof, (ii) if such Lender is a corporation, to any Affiliate of such Lender, or (iii) if such Lender is a natural person, to the spouse or descendants of such Lender or any trust for the benefit of any thereof; *provided, however,* that the Company is given written notice at the time of such assignment stating the name and address of the assignee and identifying the Securities with respect to which the rights and benefits hereunder are being assigned and such assignee expressly agrees in writing with the Company and the other Lenders to be bound by and to comply with this Agreement. Anything contained herein to the contrary notwithstanding, no Lender (or permitted assignee of an Lender) shall, without the consent of the Company, be permitted to assign any rights and/or benefits hereunder to a Person that is then actively engaged in a business that is directly competitive with the business then primarily and actively conducted or engaged in by the Company. Subject to the foregoing, this Agreement and all the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors or permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

7.2    Governing Law. This Agreement and the Notes shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California.

7.3    Counterparts; Signatures. This Agreement may be executed in one or more counterpart signature pages, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement, which shall be binding upon all of the parties hereto notwithstanding the fact that all parties are not signatory to the same counterpart. The exchange of copies of this Agreement and of signature pages by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

7.4    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

7.5    Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier,

7

CONFIDENTIAL

SLC00004530

specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 7.5):

<div style="margin-left:2em">

If to the Company:

12 Gigs, Inc.
720 Market Street, Suite 200
San Francisco, CA 94102
Attention: Chief Executive Officer
Email: nick@12Gigs.com

If to Lenders: DAN Vigdor, 1481 TAgus Av. Coral Gcbcvs, 33156
Dan @ global-Horizon. com
At the respective email/fax addresses shown on the signature page hereto.

</div>

7.6    Finder's Fee. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Lender agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which Lender or any of its officers, partners, employees or representatives is responsible. The Company agrees to indemnify and hold harmless Lender from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

7.7    Expenses. Each party shall bear its own fees and expenses in connection with the negotiation, review and execution of this Agreement.

7.8    Entire Agreement; Amendments and Waivers. This Agreement, the Notes and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The Company's agreements with each of the Lenders are separate agreements, and the sales of the Notes to each of the Lenders are separate sales. Nonetheless, any term of this Agreement or the Notes may be amended and the observance of any term of this Agreement or the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Note Holders; *provided, however,* that any such amendment, waiver or consent that materially and adversely treats one or more Lenders in a manner that is disproportionate to such treatment of all other Lenders (i.e., not on a *parri passu* basis), such amendment or waiver shall also require the written consent of the Lenders disproportionately treated. This Section 7.8 may not be amended without the written consent of the Company and all Lenders. Any waiver or amendment effected in accordance with this Section shall be binding upon each party to this Agreement and any holder of any Note purchased under this Agreement at the time outstanding and each future holder of all such Notes.

7.9    Effect of Amendment or Waiver. Each Lender acknowledges that by the operation of Section 7.8 hereof, the Majority Note Holders will have the right and power to

<div style="text-align:center">8</div>

CONFIDENTIAL

SLC00004531

diminish or eliminate all rights of such Lender under this Agreement and each Note issued to such Lender; *provided, however,* that any such amendment, waiver or consent that materially and adversely treats one or more Lenders in a manner that is disproportionate to such treatment of all other Lenders (i.e., not on a *parri passu* basis), such amendment or waiver shall also require the written consent of the Lenders disproportionately treated. This Section 7.9 may not be amended without the written consent of the Company and all Lenders.

7.10    Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

7.11    "Market Stand-Off" Agreement.  Each Lender hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's Initial Offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such shares or any such securities are then owned by the Lender or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise.  The foregoing provisions of this Section 7.11 shall apply only to the Company's initial offering of equity securities, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Lenders if all officers, directors and greater than five percent (5%) stockholders of the Company enter into similar agreements.  The underwriters in connection with the Company's Initial Offering are intended third-party beneficiaries of this Section 7.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.  Each Lender further agrees to execute such agreements as may be reasonably requested by the underwriters in the Company's Initial Offering that are consistent with this Section 7.11 or that are necessary to give further effect thereto.

In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the registrable securities of each Lender (and the shares or securities of every other Person subject to the foregoing restriction) until the end of such period. Notwithstanding the foregoing, if (i) during the last seventeen (17) days of the one hundred eighty (180)-day restricted period, the Company issues an earnings release or material news or a material event relating to the Company occurs; or (ii) prior to the expiration of the one hundred eighty (180)-day restricted period, the Company announces that it will release earnings results during the sixteen (16)-day period beginning on the last day of the one hundred eighty (180)-day period, the restrictions imposed by this Section 7.11 shall continue to apply until the expiration of the eighteen (18)-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

CONFIDENTIAL

SLC00004532

Each Lender agrees that a legend reading substantially as follows shall be placed on all certificates representing all registrable securities of each Lender (and the shares or securities of every other Person subject to the restriction contained in this Section 7.11):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD AFTER THE EFFECTIVE DATE OF THE ISSUER'S REGISTRATION STATEMENT FILED UNDER THE ACT, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SECURITIES, A COPY OF WHICH MAY BE OBTAINED AT THE ISSUER'S PRINCIPAL OFFICE. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

7.12    Stock Purchase Agreement. Each Lender understands and agrees that the conversion of the Notes into Conversion Shares may require such Lender's execution of certain agreements in the form agreed to by investors in the Next Equity Financing relating to the purchase and sale of such securities as well as registration, co-sale, rights of first refusal, rights of first offer and voting rights, if any, relating to such securities.

7.13    Exculpation Among Lenders. Each Lender acknowledges that it is not relying upon any Person, firm, corporation or stockholder, other than the Company and its officers and directors in their capacities as such, in making its investment or decision to invest in the Company. Each Lender agrees that no other Lender nor the respective controlling persons, officers, directors, partners, agents, stockholders or employees of any other Lender shall be liable for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase and sale of the Securities.

7.14    Acknowledgement. In order to avoid doubt, it is acknowledged that each Lender shall be entitled to the benefit of all adjustments in the number of shares of Common Stock of the Company issuable upon conversion of the Preferred Stock of the Company or as a result of any splits, recapitalizations, combinations or other similar transaction affecting the Common Stock or Preferred Stock underlying the Conversion Shares that occur prior to the conversion of the Notes.

7.15    Covenants of the Company to Deliver Information and Financial Statements. The Company shall deliver to the Lenders such financial statements or information as the Company provides to its stockholders simultaneously with the delivery thereof to the stockholders.

7.16    Further Assurance. From time to time, the Company shall execute and deliver to the Lenders such additional documents and shall provide such additional information to the Lenders as any Lender may reasonably require to carry out the terms of this Agreement and the Notes and any agreements executed in connection herewith or therewith, or to be informed of the financial and business conditions and prospects of the Company.

*[Signature Pages Follow]*

10

CONFIDENTIAL

SLC00004533

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**12 GIGS, INC.**

By: _____

Nicholas Talarico
Chief Executive Officer

CONFIDENTIAL

SLC00004534

**DAN VIGDOR**

By: _____

Print Name:  Dan Vigdor

Address: _____1431  TAGus  Av.____

_____Coral Cables, Fl. 33156____

Facsimile: _____(1) 305-665-0423____

Email: _____dan@global-horizon.com____

[SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT]

Jan 26 12 06:44p

CONFIDENTIAL

SLC00004535

## SCHEDULE OF LENDERS

### Initial Closing Date:  September 26, 2011

| Name of Lender | Principal Amount of Note |
|---|---|
| Karl Jacob | $50,000.00 |
| Warren Konkel | $50,000.00 |
| Ankur Nagpal | $50,000.00 |
| Stephen Talarico | $100,000.00 |
| **Initial Closing Total:** | **$250,000.00** |

### Subsequent Closing Date:  November 1, 2011

| Name of Lender | Principal Amount of Note |
|---|---|
| 500 Startups, L.P. | $75,000.00 |
| **Subsequent Closing Total:** | **$75,000.00** |

### Subsequent Closing Date:  December 8, 2011

| Name of Lender | Principal Amount of Note |
|---|---|
| James Rainey | $25,000.00 |
| **Subsequent Closing Total:** | **$25,000.00** |

### Subsequent Closing Date:  January 25, 2012

| Name of Lender | Principal Amount of Note |
|---|---|
| Dan Vigdor | $100,000.00 |
| Stephen Bradway | $100,000.00 |
| **Subsequent Closing Total:** | **$200,000.00** |

Jan 25 12 06:44p

CONFIDENTIAL

SLC00004536

EXHIBIT C

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.   THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.

FOR FLORIDA RESIDENTS: THE UNITS REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT. IN ADDITION, ALL FLORIDA RESIDENTS SHALL HAVE THE PRIVILEGE OF VOIDING A PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER. AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER. THE SECURITIES BEING OFFERED HAVE NOT BEEN REGISTERED WITH THE FLORIDA OFFICE OF FINANCIAL REGULATION.

## 12 GIGS, INC.

### CONVERTIBLE PROMISSORY NOTE

**Principal Amount**                                          **Date of Issuance**

**$100,000.00**                                               **January 25, 2012**

FOR VALUE RECEIVED, **12 Gigs, Inc.**, a California corporation (the "Company"), hereby promises to pay to the order of **Stephen Bradway** (the "Lender"), the principal amount identified above, together with interest thereon from the date of issuance of this Convertible Promissory Note identified above. Interest shall accrue at a rate of six percent (**6%**) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 2.2 of that certain Note Purchase Agreement dated September 26, 2011  among the Company, Lender and certain other investors (the "Purchase Agreement"), the principal and accrued interest shall be due and payable by the Company on demand by the Majority Note Holders at any time after the Maturity Date.

This Note is one of a series of Convertible Promissory Notes issued pursuant to the Purchase Agreement. Capitalized terms not defined herein shall have the meaning set forth in the Purchase Agreement.

1.      Payment. All payments shall be made in lawful money of the United States of America at the principal office of the Company, or at such other place as the holder hereof may from time to time designate in writing to the Company. Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal. Prepayment of principal, together with accrued interest, may not be made without the

written consent of the Majority Note Holders.  The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

2.      Security.  This Note is a general unsecured obligation of the Company.

3.      Conversion of the Notes.  This Note and any amounts due hereunder shall be convertible into Conversion Shares in accordance with the terms of Section 2.2 of the Purchase Agreement.  As promptly as practicable after the conversion of this Note, the Company at its expense shall issue and deliver to the holder of this Note, upon surrender of the Note, a certificate or certificates for the number of full Conversion Shares issuable upon such conversion. The "Conversion Price" applicable to this Note shall be:

3.1      with respect to a conversion pursuant to Section 2.2(a) of the Purchase Agreement, the lower of (A) the product of (y) **85%** and (z) the price paid per share for Equity Securities by the investors in the Next Equity Financing or (B) the quotient resulting from dividing (y) the Valuation Cap (as defined below) by (z) the number of shares of outstanding common stock of the Company immediately prior to the closing of the Next Equity Financing (assuming conversion of all securities convertible into common stock, exercise of all outstanding options and warrants to purchase common stock, but excluding, for this purpose, the conversion contemplated by Section 2.2(a) of the Purchase Agreement); and

3.2      with respect to a conversion pursuant to Section 2.2(b) of the Purchase Agreement, the quotient resulting from dividing (A) the Valuation Cap (as defined below) by (B) the number of shares of outstanding common stock of the Company immediately prior to the closing of the Corporate Transaction (assuming conversion of all securities convertible into common stock and exercise of all outstanding options and warrants to purchase common stock, but excluding, for this purpose, the conversion contemplated by Section 2.2(b) of the Purchase Agreement).

3.3      "Valuation Cap" shall mean  $6,000,000; *provided, however,* that the Valuation Cap shall automatically be $4,000,000 if the following circumstance occurs:

(a)      the Company does not raise an aggregate of at least $1,000,000.00 principal amount of convertible promissory notes pursuant to the Purchase Agreement by March 30, 2012 (including this Note and previously issued Notes), and

(b)      the Company does not record gross revenue of $21,000.00 or more during any seven (7) consecutive day period prior to March 15, 2012.

4.      Amendments and Waivers; Resolutions of Dispute; Notice.  The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice shall be conducted pursuant to the terms of the Purchase Agreement.

5.      Successors and Assigns.  This Note applies to, inures to the benefit of, and binds the successors and assigns of the parties hereto; *provided, however,* that the Company may not assign its obligations under this Note without the written consent of the Majority Note Holders. Any transfer of this Note may be effected only pursuant to the Purchase Agreement and by

2

CONFIDENTIAL

SLC00002630

Jan 25 2012 5:50PM    HP LASERJET FAX                                    p.3

surrender of this Note to the Company and reissuance of a new note to the transferee. The Lender and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and any other Lenders.

6.    Officers and Directors not Liable. In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

7.    Expenses. The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs"). The Company agrees that any delay on the part of the holder in exercising any rights hereunder will not operate as a waiver of such rights. The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

8.    Governing Law. This Note shall be governed by and construed under the laws of the State of California as applied to other instruments made by California residents to be performed entirely within the State of California. Notwithstanding any provision of this Convertible Promissory Note to the contrary, this Convertible Promissory Note shall be (to the extent necessary to satisfy the requirements of Section 22062(b)(3)(D) of the California Financial Code) subject to the implied covenant of good faith and fair dealing arising under Section 1655 of the California Civil Code.

9.    Approval. The Company hereby represents that its board of directors, in the exercise of its fiduciary duty, has approved the Company's execution of this Convertible Promissory Note based upon a reasonable belief that the principal provided hereunder is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation. In addition, the Company hereby represents that it intends to use the principal of this Convertible Promissory Note primarily for the operations of its business, and not for any personal, family or household purpose.

10.    Warrant. As a further inducement to the parties to enter into this transaction, the Company shall issue a warrant to purchase shares of Class A Common Stock of the Company in substantially the form attached hereto as Exhibit A.

12 GIGS, INC.

By: _____

Nicholas Palarico
Chief Executive Officer

3